EVANS, Circuit Judge,
dissenting.
When a poker player looks at his hand and sees five different even-numbered cards, only two of which are in the same suit, he knows there’s no way he can win. His only option is to fold. A defense lawyer in a murder case who is dealt an impossibly bad hand can’t fold. He must do the best he can even if the deck, and the odds, are stacked against him. I think Daniel Wilson’s defense attorney (Andrew Schnack) did about as well as could be expected given the awful hand he was dealt. I would not send this case back to the district court for more proceedings. For the reasons that follow, I dissent.
This indeed was a tragic crime. On the morning of November 20, 2003, Jerome Fischer left the Quincy, Illinois, home he shared with his wife and four children. He set out to pick up Wilson, one of his employees, and drive the two of them to the airport. As the Appellate Court of Illinois put it, “The two men were to attend a company meeting in New Hampshire. While Fischer waited in his car for Wilson, Wilson put a gun in his pocket, walked out of his home, walked over to the car, and pulled the trigger.” Fischer died on the spot. A photo admitted into evidence at Wilson’s trial (Attorney Schnack objected to it but its admissibility is not an issue at this time) showed a gruesome scene of broken glass and blood splattered on the steering wheel, console, floorboard, and passenger side window.
After killing Fischer, Wilson returned to his house and called 9-1-1. He told the police dispatcher I “just killed my employer.” The state appellate court noted that when the dispatcher asked if it was an accident, Wilson replied “No, I did it purposefully.” Shortly thereafter, he told Quincy police officers who arrived at his home that he killed Fischer “over an argument that had been happening for a while.” The officers at the scene said Wilson didn’t seem “confused or disorientated,” that he was “pretty cognizant” and that he answered questions “in a pretty straightforward manner.” Finally, after saying he killed his boss, Wilson said he wished he had a chance “to start over.”
As the majority observes, the jury was given three verdict options: guilty, guilty but mentally ill, and not guilty by reason of insanity. It settled on the middle option.[1] After a direct appeal (which raised *358 many issues) was denied by the Appellate Court of Illinois, Wilson, with a new lawyer, filed a petition for postconviction relief, alleging that he received ineffective assistance of counsel. The trial court dismissed the petition. Wilson then filed a motion to reopen proofs, supplement the record, and reconsider the order denying relief. After a hearing, the state trial court granted the motion to reopen proofs and supplement the record, but it denied the motion to reconsider the dismissal order. Wilson appealed and the state appellate court affirmed the trial court’s order in 2008. The Supreme Court of Illinois denied leave to appeal. With his state remedies exhausted, Wilson filed a petition for habeas corpus in the federal district court. It was denied. The majority now sends the case back to the district court where the state can present new evidence regarding the adequacy of Schnack’s representation but if it has none, or if what it has comes up short, the district court must schedule an evidentiary hearing and determine if the attorney’s shortcomings prejudiced Wilson. None of this, in my view, is necessary.
Although the majority recites a litany of sins Attorney Schnack allegedly committed, the primary shortcoming seems to be his decision not to insist that Dr. Parwatikar reexamine Wilson some five months later, after he emerged from his stay in a mental hospital with a pronouncement that he was “fit” to stand trial. The reexamination, this time a “sanity” examination, should have obviously been undertaken. Or so says the majority. Perhaps that’s right. But perhaps it isn’t.
As I see it, Schnack had two less than ideal choices. He could let Dr. Parwatikar testify that Wilson was insane at the time of the murder without conducting a second exam. That, of course, is something a skilled prosecutor, like the one here, would explore on cross-examination and drive home during closing arguments. On the other hand, Schnack could have insisted on a second exam by Dr. Parwatikar but that would be risky as well. What if, after a second exam, Dr. Parwatikar came to the same conclusion reached by the prosecution’s expert, Dr. Henry? That would put the kibosh on any slight hope, given the facts of this case, that the jury would give Wilson a pass with a finding of not guilty by reason of insanity. Whatever option Schnack picked was going to have some downside so I cannot say the one he went with was utterly unreasonable. In fact, the one he went with might well have been the best. I say that because, after reading Dr. Parwatikar’s August 18, 2004, report prepared in response to a June 23, 2004 letter from Attorney Schnack (both are attached as exhibits to this dissent), I can’t say forgoing a reexamination was ill-advised.
For Wilson to have any chance, he needed Dr. Parwatikar in his corner. Why take a chance of losing him? Schnack could present Dr. Parwatikar to the jury as a disinterested expert. Schnack didn’t pick him out (as the prosecution did for Dr. Henry), instead he was originally selected to get involved in the ease as a court-appointed expert witness. Of all the psychiatrists to put on the case, would a judge select an incompetent? That’s not a bad defense argument. I recognize, of course, that a “fitness to stand trial” examination and a “sanity at the time of the crime” exam are not the same thing. But they are cousins. If you take a car into a mechanic for a muffler job, he might also *359 say, “Oh, by the way, I’ve looked underneath your car and the brakes should be replaced.” Would it be unreasonable to think that a psychiatrist can’t, in a manner of speaking, (“I thought he was unfit to stand trial but I also concluded that he was insane when he pulled the trigger”) do the same thing?
Another reason not to take the chance of losing Dr. Parwatikar concerns timing. He examined Wilson — actually sat down and talked to him — rather soon after Fischer was murdered. Because that chat took place much closer in time to the commission of the crime, it’s not unreasonable to think that a jury might give an opinion growing out of that meeting more weight than one based on an examination that took place so much later. Like Dr. Henry’s.
The majority also says that Schnack should have spent more time prepping Dr. Parwatikar for his testimony. The state trial court, while considering whether Schnack spent adequate preparation time with Dr. Parwatikar, observed that the direct examination “... was cogent, it flowed.” Although the trial judge thought that Schnack only spent a lunch hour preparing Dr. Parwatikar for his testimony, he stated that Schnack “sure got a lot out of that one-hour lunch period. Of course, part of it is that I’m sure Dr. Parwatikar has a lot of experience in that sort of testimony himself. It would seem to me that they knew each other; this was not some off-the-cuff sort of presentation.” Since the trial court, who witnessed Dr. Parwatikar’s testimony, thought the testimony was more than adequate, I cannot understand why the majority thinks more prep time was needed.
Another reason why Wilson needed Dr. Parwatikar was that all the “Catholic Conspiracy” evidence, which the majority recounts, came to the jury via Schnack’s direct examination of the doctor who related what Wilson said during the fitness examination. With that in the record, much of it pretty looney, I see no reason why not calling “family members” can be view as an incompetent decision.
The six affidavits of family members filed in the state post-conviction proceedings (from an ex-wife, a stepdaughter, a step-father, an aunt, and Wilson’s mother and the step-daughter of Wilson’s mother) do little to shed light on Wilson’s mental state at the moment he gunned down his boss. Plus, some of the “facts” asserted in the affidavits would have, if put before the jury, cast Wilson in a less than sympathetic light. For instances, the step-father said, “Dan thought his step-daughter had been coached by his ex-wife to seduce him.” The step-daughter, in her affidavit, said she ran away from home and had not even seen Dan Wilson during the two years before the murder took place. And an interesting aside: Wilson’s ex-wife was, according to her affidavit, “subpoenaed by the State’s Attorney to testify as a State witness, but I was never called.”
The majority also suggests that Schnack should have argued that Wilson was insane because he was acting “under the pressure of delusions.”[2] This suggestion is rather odd because as the majority notes, Illinois eliminated the inability to conform one’s conduct to the law prong from its insanity defense statute in 1995. Undeterred, however, the majority extensively quotes then *360 Judge Cardozo from a New York case he penned almost two years before the United States entered World War I and 17 years before President Hoover appointed him to a seat on the Supreme Court. The majority says, “It is a reasonable inference that the Supreme Court of Illinois would approve an insanity defense along the lines of Cardozo’s opinion and it would be available to Wilson.” I don’t think so.
As I see it, Attorney Schnack’s representation of Wilson was not constitutionally ineffective. More importantly, under ADEPA, the Appellate Court of Illinois did not unreasonably apply Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). I would affirm the district court’s judgment dismissing Wilson’s petition for habeas relief.
[[Image here]]
*361 [[Image here]]
*362 [[Image here]]
*363 [[Image here]]
*364 [[Image here]]

. It’s true, as the majority notes, that Wilson received a 55-year sentence. But 30 were for *358 the murder. The other 25 were tacked on because, under Illinois law, the crime was committed with a firearm.

. On direct appeal, the Illinois Appellate Court stated that the jury may not have found Dr. Parwatikar’s testimony to be compelling because "[f]or example, Parwatikar's continued references to the 'pressures’ of Wilson’s delusions often spoke more to Wilson's ability to conform his behavior to the requirements of the law, than to Wilson's ability to appreciate the criminality of his conduct.”